UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| THE ROBINSON FAMILY TRUST, derivatively on behalf of FIRSTMERIT CORPORATION, : : : | Civil Action No. 5:12-cv-01713 (Patricia A. Gaughan, Judge) |
| Plaintiff, : | |
| v. : | |
| PAUL G. GREIG, TERRENCE E. BICHSEL, WILLIAM P. RICHGELS, DAVID G. GOODALL, LARRY A. SHOFF, STEVEN H. BAER, R. CARY BLAIR, ROBERT W. BRIGGS, KAREN S. BELDEN, JOHN C. BLICKLE, RICHARD COLELLA, GINA D. FRANCE, J. MICHAEL HOCHSCHWENDER, TERRY L. HAINES, CLIFFORD J. ISROFF and PHILIP A. LLOYD II, : : : : : : : : : : : | |
| Defendants, : | |
| and : | |
| FIRSTMERIT CORPORATION, : | |
| Nominal Defendant. : | |

**PLAINTIFF THE ROBINSON FAMILY TRUST'S RESPONSE TO MOTIONS TO CONSOLIDATE RELATED ACTIONS AND APPOINT LEAD COUNSEL**

## I.    PRELIMINARY STATEMENT

The Robinson Family Trust (the 'Robinson Trust'), by and through its undersigned attorneys, submits this memorandum in further support of its Motion to Consolidate Related Actions, Appoint Lead Counsel, and Appoint Liaison Counsel (the 'Robinson Motion'), filed on August 3, 2012.  Specifically, in that motion, the Robinson Trust moved to consolidate all related shareholder derivative actions on behalf of FirstMerit Corporation ('FirstMerit' or the 'Company') and for the appointment of The Weiser Law Firm, P.C. (the 'Weiser Firm') as Lead Counsel and Strauss Troy Co., LPA ('Strauss Troy') as Liaison Counsel for plaintiffs.[1]  This memorandum is submitted in opposition to the Haverhill Motion and the Smalley Motion.[2]

Here, among the various movants, the Robinson Trust and its chosen counsel are the best suited to represent the interests of FirstMerit.  Even before the Actions were even initiated, the

---

[1] There are three related pending shareholder derivative actions in this Court that were brought on behalf of FirstMerit against certain of the Company's current and former officers and directors, arising from a failed 'say on pay' vote in response to unwarranted and excessive spending of Company (*i.e.*, stockholders') funds on 2011 executive compensation. On July 3, 2012, the Robinson Trust initiated the shareholder derivative litigation on behalf of FirstMerit by filing a complaint (Civil Action No. 5:12-cv-1713) (the 'Robinson Trust Action'). On July 11, 2012, plaintiff Smalley filed a second shareholder derivative complaint on behalf of nominal defendant FirstMerit (Civil Action No. 5:12-1771) (the 'Smalley Action'). On July 20, 2012, plaintiff Haverhill filed a third shareholder derivative complaint on behalf of nominal defendant FirstMerit (Civil Action No. 5:12-cv-1886) (the 'Haverhill Action') (collectively, the Robinson Trust Action, the Smalley Action, and the Haverhill Action are referred to as the 'Actions'). Plaintiffs in each of the Actions assert similar causes of action on behalf of FirstMerit against the same defendants, and each case arises out of the same nucleus of operative facts. On August 1, 2012, Haverhill filed its Motion for Consolidation, Appointment of Lead Plaintiff and Appointment of Lead Counsel (the 'Haverhill Motion'). On August 10, 2012, Smalley filed his Motion for Consolidation and Appointment of Lead Counsel (the 'Smalley Motion'). On August 23, 2012, the Court consolidated the Actions under the Robinson Trust Action, but reserved ruling on the balance of issues raised in each of the motions. As such, the question of consolidation is moot and not addressed herein.

[2] The Robinson Trust, Haverhill, and Smalley agree that counsel should be appointed to lead the Actions. While the Robinson Trust and Smalley did not initially move for the appointment of a lead plaintiff, Haverhill did. The Robinson Trust respectfully submits that appointment of a lead plaintiff is not necessary in a derivative action, as it is in a securities class action. That said, because the question of a lead plaintiff is raised in the Haverhill Motion, the Robinson Trust addresses the fitness of each of the plaintiffs named in each of the Actions. For the reasons explained herein, should the Court conclude that the appointment of a lead plaintiff is beneficial, the Robinson Trust submits that it is best suited to serve in that role.

Robinson Trust and its counsel have been vigorously acting to protect and further FirstMerit's interests.

The Robinson Trust, for example, is the only plaintiff to the Actions that has shown that it is an engaged, active shareholder of FirstMerit; it voted <u>against</u> the 2011 executive compensation package that forms the core of the Action.  In contrast, neither Haverhill nor Smalley allege in their respective complaints that they voted on the issue.  And, before the other movants were even involved in this litigation, the Robinson Trust filed a detailed complaint that sought to redress the harm inflicted on FirstMerit by the misconduct of its officers and directors. In contrast, both Haverhill and Smalley simply rode the coat-tails of the Robinson Trust and have reiterated the allegations first raised in the Robinson Complaint.

Further, none of the arguments offered (respectively) in the Haverhill Motion or the Smalley Motion support their appointment.  Haverhill, for example, relies on the Private Securities Litigation Reform Act of 1995 (the 'PSLRA'), and argues that because it is an institutional investor with a large financial interest in the outcome of the Actions (and thus, presumably, is well-motivated to vigorously prosecute the Actions), that it is presumptively best suited to serve as lead plaintiff.  But the Actions are shareholder derivative actions, not class actions subject to the PSLRA, and contrary to Haverhill's assertions, there is no statutorily-mandated preference for institutional investors in the derivative context.  Even if the PSLRA applied to the Actions, Haverhill should not be appointed as lead plaintiff.  The Robinson Trust, the only plaintiff to the Actions that is a long-term FirstMerit shareholder, has continuously held shares of FirstMerit stock since 1988, and its Company holdings currently represent <u>35</u>% of its

entire investment portfolio.  In contrast, Haverhill acquired its shares of FirstMerit barely two years ago, and those holdings represent just 0.08% of its investment portfolio.[3]

For these reasons and the arguments set forth in the Robinson Motion and below, the Robinson Motion should be granted.  Nothing offered by any movant rebuts the proposition established in the Robinson Motion: the Robinson Trust and the Weiser Firm are the most adequate to serve as lead plaintiff and lead counsel.

## II.     ARGUMENT

### A.     Legal Standard

Under Fed.R.Civ.P. 23.1, a derivative action 'may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.' Fed.R.Civ.P. 23.1(a).  Thus, any prospective derivative plaintiff must meet this criteria (at minimum) in order to 'maintain' a derivative suit under Fed.R.Civ. . 23.1.  Because of the inherently fiduciary nature of the roles of lead plaintiff and lead counsel, courts considering appointees to such positions must carefully scrutinize and evaluate the adequacy of those movants to champion the interests of absent shareholders and the corporation on whose behalf they seek to sue.[4]

In applying the criteria of Fed.R.Civ.P. 23.1 – that courts must evaluate the adequacy of those who seek to serve as lead plaintiff and lead counsel in 'shareholder class and derivative' cases – District Courts within the Sixth Circuit weigh and consider:

---

[3] Smalley provides no details regarding his FirstMerit purchases.  He alleges solely that he has held FirstMerit shares since 'prior to February 2011.'  Smalley Complaint at ¶ 12.

[4] *Davis v. Comed, Inc*., 619 F.2d 588 (6th Cir. 1980), citing Fed. R. Civ. P. 23.1.

the quality of the pleading that appears best able to represent the interests of the shareholder class and derivative plaintiffs; the relative economic stakes of the competing litigants in the outcome of the lawsuit (to be accorded 'great weight'); the willingness and ability of all contestants to litigate vigorously on behalf of an entire class of shareholders; the absence of any conflict between larger, often institutional, stockholders and smaller stockholders; the enthusiasm or vigor with which the various contestants have prosecuted the lawsuit; [and] competence of counsel and their access to the resources necessary to prosecute the claims at issue.

*Kubiak v. Barbas*, 3:11-CV-141, 2011 WL 2443715, *1 (S.D. Ohio June 14, 2011).[5]

### B.    Haverhill and Smalley Fail to Show They Are the Most Adequate

Haverhill argues that it should be appointed lead plaintiff and that Scott + Scott should be appointed lead counsel because it: (i) purportedly has the largest financial interest in the litigation and is an institutional investor; and (ii) is represented by qualified counsel that filed a 'thorough and detailed' complaint and has 'vigorously' pursued the instant case.  Haverhill Motion at 6-7.  Similarly, Smalley argues that its lawyers should be appointed lead and liaison counsel because they are qualified counsel that filed the '[h]ighest [q]uality [p]leadings.' Smalley Motion at 8-12.  Neither Haverhill's nor Smalley's arguments carry the day.

### 1.    Neither the Size of Haverhill's Investment, Nor its Status as an 'Institutional Investor' Support Its Motion

The Haverhill Motion is almost entirely premised on its reliance on the PSLRA and the claim that because it holds 7,500 shares[6] of FirstMerit common stock, this 'plainly supports' its

---

[5] Quoting *Hirt v. United States Timberlands Serv. Co.*, No. 19575, 2002 WL 1558342 (Del. Ch. June 18, 2002).

[6] *See* Haverhill Motion at 6.  There is currently a discrepancy regarding Haverhill's FirstMerit holdings. In contrast to the representations made in the Haverhill Motion that Haverhill holds 7,500 FirstMerit shares, the verification submitted by an administrator of Haverhill on its behalf indicates that Haverhill holds 7,050 shares.  *See* Verification of Kathleen Gallant, Administrator, attached as Exh. 'A' to the Declaration of Brett D. Stecker (the 'Stecker Decl.') attached hereto as Exhibit 1.

motion to be appointed lead plaintiff.  This is wrong.[7]  Rather, the simple size of a movant's holdings are not probative on a motion for appointment as lead plaintiff: '[c]ourts do not mechanically look to the plaintiff with the largest number of shares; instead, the test is the relative size of the shares.'[8]  As the Southern District of Ohio recently demonstrated in *Kubiak*, to generate a meaningful metric from a movant's holdings, a court must first determine how many shares of the company's stock are outstanding and then use the movant's holdings to calculate its financial interest in the subject company on a percentage basis of the company's outstanding shares.[9]  When this analysis is utilized, it establishes that Haverhill's ownership of FirstMerit stock does not further its argument that it should be appointed lead plaintiff.

As of July 30, 2012, FirstMerit had 109,642,025 shares of common stock outstanding.[10] Haverhill represents that it holds 7,500 shares of FirstMerit common stock.  Assuming that to be the correct number, Haverhill thus holds a mere 0.0068% of FirstMerit's outstanding common stock.  Haverhill's holdings, thus, do not support its argument because courts regularly reject

---

[7] While the PSLRA has been held persuasive in the derivative context by some courts, the Robinson Trust respectfully submits that such holdings are erroneous.  Indeed, the PSLRA does not apply to shareholder derivative actions.  *See In re First Energy Corp. S'holder Deriv. Litig.*, 219 F.R.D. 584, 586 (N.D. Ohio 2004); *In re Conseco, Inc. Sec. Litig.*, 120 F. Supp.2d 729, 734 (S.D. Ind. 2000) (noting that 'the PSLRA does not directly apply to derivative actions.').  Indeed, many courts hold that in determining the adequacy of a representative derivative plaintiff, the size of the plaintiff's investment is actually irrelevant.  *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir. 1982) (citation omitted); *see also Schneider v. Austin*, 94 F.R.D. 44, 46 (S.D.N.Y. 1982) (holder of 200 shares who demonstrated conscientious prosecution of derivative action was deemed adequate representative and court noted '[d]ifferences between derivative and class actions, however, make clear that some factors used to evaluate class representatives are irrelevant when shareholders litigate for a corporation's benefit' and 'extensive reliance on class action case law is inappropriate since Rule 23.1 has developed an independent jurisprudence').

[8] *Kubiak*, 2011 WL 2443715 at *2 (emphasis in original).

[9] *Id*.

[10] *See* FirstMerit Report on Form 10-Q, at 2, filed with the SEC on August 6, 2012, attached as Exh. 'B' to the Stecker Decl.

shareholder interests as high as 6% in the subject corporation as insignificant on a lead plaintiff analysis.[11]

Haverhill's lack of financial interest in the Actions is further evidenced by the fact that its holdings of FirstMerit common stock constitute a *de minimis* portion of its overall investment portfolio.  Haverhill currently holds an investment portfolio worth approximately $139.5 million; its holdings in FirstMerit thus represent a functionally irrelevant 0.08% of its total investment portfolio.[12]  Accordingly, Haverhill's purported 'economic stake[]' in the 'outcome of the lawsuit' is miniscule – Haverhill's FirstMerit holdings represent <u>less</u> <u>than</u> <u>one-tenth</u> <u>of</u> <u>one</u> <u>percent</u> of its portfolio.[13]  Critically, and in contrast, the Robinson Trust's holdings of FirstMerit represent <u>35</u>% of its entire investment portfolio.[14]  Thus, the interests of FirstMerit and preserving the Company's value are necessarily far more critical to the Robinson Trust than to Haverhill.  This supports a strong inference that the Robinson Trust, not Haverhill, is more motivated to vigorously prosecute the Actions, rendering it the more adequate plaintiff.

Nor should the Court credit Haverhill's argument that it is somehow 'favored to serve the role as lead plaintiff' simply because it is an 'institutional investor'[15] – in essence, a hubristic

---

[11] *See Kubiak*, 2011 WL 2443715 at *2 (finding that highest percentage of ownership among competing movants, .00975%, was not relevant factor in decision on motions for appointment as lead plaintiff), citing *Wiehl v. Eon Labs*, No. Civ. A. 1116-N, 2005 WL 696764 (Del. Ch. Mar. 22, 2005) (each of the plaintiffs' respective stakes in Eon is minuscule. Indeed, 'even the largest plaintiff owns only 0.065% of Eon's shares. Its stake is simply not large enough to demonstrate a substantial relative difference that would require the court to give this factor great weight'). Curiously, Haverhill cites *Wiehl* with approval – but fails to discuss the fact that the case actually stands for the very opposite of the proposition Haverhill advances. Haverhill Motion at 6.

[12] *See* Public Employee Retirement Administration Commission, 2011 Annual Report, Haverhill, at 52, attached as Exh. 'C' to Stecker Decl.

[13] *Kubiak*, 2011 WL 2443715 at *2 ('the relative economic stakes of the competing litigations in the outcome of the lawsuit [] to be accorded 'great weight'[]').

[14] *See* Declaration of John and Martha Robinson, attached as Exh. 'D' to the Stecker Decl.

[15] Haverhill Motion at 6, citing *Horn v. Raines*, 227 F.R.D. 1, 3 (D.D.C. 2005).

claim that it is more 'sophisticated' than a family trust.  First, the notion that 'institutional' investors are 'favored' flows from, as discussed above, an improper extension of the provisions of the PSLRA to derivative cases.  *Supra* at 5.[16]  It thus fails on its face.  Second, Haverhill's proposition that an institutional investor is necessarily a more adequate lead plaintiff than an individual investor (or, in this instance, a family trust) – simply because it is an institution – is flawed as a matter of logic.  Haverhill is a pension fund, and its Motion completely disregards the reality that the allegiance of any pension fund is <u>always</u> to its pensioners.  The bureaucracy that acts on behalf of Haverhill here cannot possibly represent to this Court that it will put the best interests of the Company ahead of Haverhill's interests or the interests of Haverhill's pensioners at all times.  By contrast, the trustees to the Robinson Trust, a husband and wife who have represented that they will retain the Robinson Trust's FirstMerit stockholdings throughout the pendency of the Actions, have expressly acknowledged and accepted their fiduciary duty to put FirstMerit's best interests ahead of the Robinson Trust's interests and their own personal interests at all times.[17]  Accordingly, the Robinson Trust is necessarily the more adequate plaintiff.

---

[16] Further, as Haverhill's own authority recognizes, the institutional preference in securities class actions under the PSLRA is grounded in the fact that in most instances, '[a]s the largest shareholders in most companies, [institutional investors] are the ones who have the most to gain from meritorious securities litigation.' *Dollens v. Zions*, No. 01- 5931, 2001 WL 1543524 (N.D. Ill. Dec. 4, 2001).  But as noted above, under the sound and convincing logic applied by this Court's sister court in the Southern District of Ohio, the mere fact that an investor holds the greatest number of shares does not 'mechanically' render his interest in serving as a lead plaintiff in a derivative action any greater than any other investor.  Rather, any presumption favoring an investor with the largest number of shares should only be applied where the movant holds a substantial percentage of the outstanding shares of the company in question.  *Kubiak*, 2011 WL 2443715 at *2.  Thus, the logic that drove the *Dollens*' court's conclusion cannot apply here: Haverhill's financial interest in FirstMerit, a mere .0068% of FirstMerit's outstanding shares, is not meaningfully greater than any other movant's interest.

[17] Declaration of John and Martha Robinson at 7, attached as Exh. 'D' to the Stecker Decl.

### 2. The Quality of Haverhill's and Smalley's Pleadings Do Not Support Their Motions

Next, both Haverhill and Smalley argue that their respective motions should be granted because they each have filed the highest quality pleadings.[18]  These arguments also fail.

The Robinson Trust agrees that Haverhill's and Smalley's initial complaints are 'thorough and detailed,' predicated on vigorous and 'significant research into the allegations,' and of the '[h]ighest [q]uality.'[19]  The Haverhill and Smalley complaints differ little from the complaint that was filed first by the Robinson Trust, long before Haverhill and Smalley filed their cases.[20]  As such, Haverhill's and Smalley's complaints are derivative (in more than one sense of the word) and do not support their argument that they or their counsel should be appointed to lead the Actions because courts give no weight to later-filed complaints that track earlier-filed complaints.[21]  Rather, if anything, Haverhill's and Smalley's claims about the quality of their pleadings only serve to advance the proposition that the Robinson Trust and their counsel are far more qualified and adequate to lead the Actions because they led the charge by drafting a detailed and well-researched complaint that was worthy of imitation.[22]

---

[18] Haverhill Motion at 7 (Haverhill and its counsel have 'vigorously' prosecuted the instant case by drafting and filing a 'thorough and detailed' complaint); Smalley Motion at 12 (Smalley's counsel has filed the '[h]ighest [q]uality [p]leadings').

[19] *Id.*

[20] The Robinson Trust filed its complaint 17 days before Haverhill filed its complaint, and 8 days before Smalley filed his complaint.

[21] *In re Oclaro, Inc. Derivative Litig.*, No. C-11-3176, 2011 WL 4345099 (N.D. Cal. Sept. 14, 2011) (regarding appointment of lead plaintiffs and lead counsel, courts give no weight to later-filed complaints that track earlier complaints).

[22] Indeed, some courts hold that the plaintiff who first files a derivative case is the more appropriate lead plaintiff because by following in his footsteps, later plaintiffs demonstrate the appropriateness of his actions. *See Wright v. Krispy Kreme Doughnuts, Inc.*, 232 F.R.D. 528 (M.D.N.C. 2005) (appointing first to file plaintiff as lead and denying motion to be appointed lead by later intervening plaintiff).

### C. The Robinson Trust Has Shown That It, and the Weiser Firm, are the Most Adequate to Lead the Actions and Should be Appointed Lead Plaintiff and Lead Counsel

Additional factors not addressed in the Haverhill or Smalley motions further weigh in favor of granting the Robinson Motion.  Mainly, the Robinson Trust is ideally suited and the most adequate to prosecute the Actions because it: (i) has continuously been a shareholder of FirstMerit since 1988, nearly a quarter of a century, and has consistently acted to protect the best interests of FirstMerit and its shareholders by, *inter alia*, voting against the proposed 2011 executive compensation that is the subject of the Actions; and (ii) is represented by highly competent lawyers that have led the way in prosecuting the Actions.

### 1. The Robinson Trust Is the Only Plaintiff That Has Demonstrated Its Long-Term Interests Are Aligned With FirstMerit's Long-Term Interests

As a preliminary matter, it is well-established that Fed.R.Civ.P. 23.1 'implies that plaintiffs asserting a derivative claim must be shareholders at the time of the alleged wrong and must retain ownership for the duration of the lawsuit.'[23]  Thus, it is critical to the question of a given derivative plaintiff's adequacy that it is willing to retain its shares throughout the duration of the litigation.  If it sells its shares before the conclusion of the derivative litigation, it necessarily would be rendered inadequate – for lack of standing – to represent the interests of the Company.  Here, the Robinson Trust has not only continuously held shares of FirstMerit for almost twenty-five years, it has committed to retain 'its shares of FirstMerit stock throughout the duration of the Action.'[24]  Neither Haverhill nor Smalley have held their FirstMerit shares for

---

[23] *Guenther v. Pacific Telecom, Inc.*, 123 F.R.D. 341, 348 (D. Or. 1987) (citing *Lewis v. Chiles*, 719 F.2d 1044, 1047 (9th Cir. 1983)).

[24] *See* Declaration of John and Martha Robinson, attached as Exh. 'D' to the Stecker Decl.  To be clear: by making this representation, the Robinson Trust declares that it is willing to put representation of the Company's interests ahead of its own financial interests. That is, the Robinson Trust necessarily declares that even if it is in its financial interest (for whatever reason) to sell its holdings of FirstMerit, that it still

even a fraction of the time that the Robinson Trust has held FirstMerit stock.  Nor have they represented that they are committed to continuing to hold their shares of FirstMerit throughout the duration of the Action.

The Robinson Trust is an active, engaged shareholder that is committed to the Action and protecting the Company's interests.  Indeed, not only did the Robinson Trust participate in the 'say on pay' referendum on the executive compensation package proposed in FirstMerit's April 18, 2012 Proxy that is the core of this Action – it voted against it.[25]  Neither Haverhill nor Smalley has represented that they even participated in FirstMerit's April 18, 2012 'say on pay' referendum.

Accordingly, the Robinson Trust has demonstrated that it has a substantial and long-term interest in ensuring the well-being of FirstMerit, that it has consistently sought to protect FirstMerit's interests (and those of its shareholders), and that it has been an active, engaged participant in the 'say on pay' battle since its inception.  Haverhill and Smalley have not.

### 2. The Weiser Firm and Strauss Troy Are Highly Qualified and Best Suited to Serve as Lead and Liaison Counsel

In selecting lead counsel and liaison counsel, the 'guiding principle' is who will 'best serve the interest of the plaintiffs.'[26]  The criteria for selecting lead counsel include, *inter alia,* its experience and prior success record.[27]  The Weiser Firm has earned an excellent reputation as a nationwide leader in prosecuting stockholder derivative claims and, in particular, as it has

---

will not do so because it recognizes that to serve as a lead plaintiff, it must put the Company's interests before its own.

[25] *See* Declaration of John and Martha Robinson, attached as Exh. 'D' to the Stecker Decl.

[26] *Millman ex rel. Friedman's, Inc. v. Brinkley*, No. 03-3831, 2004 WL 2284505, *3 (N.D. Ga. Oct. 1, 2004).

[27] *Id.* (citations omitted).

demonstrated in this very District in *KeyCorp*,[28] it has led the way in prosecuting derivative actions based on 'say on pay' referenda.[29]

Specifically, in *KeyCorp*, the Weiser Firm served as lead counsel and produced what it believes to be the first-ever settlement of any 'say-on-pay' derivative action.  The *KeyCorp* derivative action – very much like the Actions this Court now considers – was based on allegations of misconduct arising from the failure of the KeyCorp Board of Directors to amend the executive compensation awarded for 2009, even though a majority of KeyCorp's voting stockholders rejected such compensation in a 'say on pay' vote.  The settlement of the *KeyCorp* case provided for a series of corporate governance measures related to: (i) the ideological underpinnings of compensation principles at KeyCorp; (ii) the actual award of executive compensation at KeyCorp; (iii) the disclosure of those decisions and ideology in KeyCorp's financial filings; (iv) the composition of the KeyCorp Board, its sub-committees, and their advisors; and (v) KeyCorp's and its Board's ongoing relationship with KeyCorp shareholders.  In addition, pursuant to the *KeyCorp* settlement, certain of the defendants relinquished highly-valuable economic rights which existed under their respective employment contracts.

Further, Robert B. Weiser, the founder of the Weiser Firm, has been involved in some of the most successful shareholder derivative actions in history, which have expanded or secured the rights of stockholders, including the well-known *Oracle*[30] and *Broadcom*[31] cases.  In addition

---

[28] *See In re KeyCorp Derivative Litig.,* No. 1:10-cv-01786-DAP (N.D. Ohio 2010) ('*KeyCorp*').

[29] A copy of the Weiser Firm's resume is attached as Exh. 'E' to the Stecker Decl.

[30] *See In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003) (one of the largest derivative settlements ever at the time it was reached).  In *Oracle*, the plaintiffs challenged certain multi-million dollar stock sales made by Oracle's senior officers, including its founder Larry Ellison.  Oracle's Board of Directors appointed a special litigation committee ('SLC') to investigate plaintiffs' claims, and after a lengthy investigation, the SLC moved to dismiss the case, having concluded that the claims lacked merit. Among other things, plaintiffs challenged the independence of the SLC members, their good faith, and their ultimate conclusions.  The Delaware Chancery Court denied the SLC's motion, allowing the action

- 12 -

to the foregoing, beginning in 2006, the Weiser Firm was at the forefront of the national investigation and prosecution of derivative 'stock option backdating cases.'  In connection therewith, the Weiser Firm was appointed lead or co-lead counsel in scores of cases, and has been partially responsible for the recovery of over $100 million in settlements for the subject corporations.[32]

More recently, the Weiser Firm obtained extraordinary relief in connection with the settlement of a shareholder derivative action brought on behalf of Vitacost.com, Inc. ('Vitacost'),[33] which actually preserved that company's corporate form and the equity interests

---

to proceed to trial.  At the time it was issued, the *Oracle* decision was one of only four reported Delaware cases where a SLC's motion to dismiss was denied by a Delaware chancellor, and many commentators view the *Oracle* case as a landmark decision for shareholders.  For example, the *Wall Street Journal* called the seminal *Oracle* decision 'one of the most far-reaching ever on corporate governance.'  The *Oracle* case eventually settled for $100 million, making it one of the largest derivative settlements in history at the time into which it was entered.  *Oracle*, and its impact on corporate governance matters nationwide, is the subject of numerous scholarly articles and treatises.

[31]  *See David v. Wolfen, et al.* ('*Broadcom*'), No. 01-CC-03930 (Orange Cnty. Sup. Ct.).  Like *Oracle*, *Broadcom* produced a groundbreaking settlement.  In connection with the eventual settlement of *Broadcom*, plaintiffs were able to compel Broadcom to make sweeping, substantial changes to its corporate governance practices, which included a provision that allows Broadcom's shareholders to nominate directors to Broadcom's Board of Directors.  In particular, the shareholder-nominated director provision was thought to be a highly significant and unusual achievement for Broadcom's shareholders. As the *Associated Press* reported in commenting on the settlement: '[i]n contrast to the Broadcom settlement the Securities and Exchange Commission has met fierce resistance to a proposal just to allow shareholder nominations under very limited circumstances.'  Bruce Meyerson, *Shareholder Suits Means More Money For Lawyers, But Bring Governance Gains*, *Associated Press*, July 27, 2004.  This type of corporate governance relief has only been achieved in a handful of shareholder derivative actions.

[32]  *See, e.g., In re Home Depot Inc., Derivative Litig.*, No. 07-CV-0356-RLV (N.D. Ga.); *In re KB Home S'holder Derivative Litig.*, No. CV-06-05148-FMC(CTx) (C.D. Cal.); *In re Family Dollar, Inc., S'holder Derivative Litig.*, No. 06-CV-00510(W) (W.D.N.C.).  Further, in 2010, the Weiser Firm obtained $6.5 million on behalf of TeleTech Holdings, Inc., as well as a comprehensive set of corporate governance reforms, in a shareholder derivative action brought in the Delaware Chancery Court entitled, *Gregory v. Tuchman*, C.A. No. 3925-CC (Del. Ch.) ('*TeleTech*').  During the hearing in which the settlement was finally approved, Chancellor Chandler cited the *TeleTech* case as a 'very generous' settlement which was 'highly beneficial' to TeleTech and its stockholders.  *See*  Transcript of January 5, 2010 Settlement Hearing at 26-27 attached as Exh. 'F' to the Stecker Decl.  Chancellor Chandler also specifically complimented plaintiff's counsel for their efforts.  *Id.*

[33]  *See Kloss v. Kerker, et. al.*, Case No.: 502010CA018594XXXXMB (Fl. Circuit Ct., 15th Judicial Circuit, Palm Beach Cnty).

of its shareholders.  The *Vitacost* derivative action centered upon Vitacost's December 7, 2010 announcement that its historical financial statements could not be relied upon due to a failure to adhere to certain critical corporate formalities fourteen years earlier.  As a result, trading in Vitacost stock was halted by NASDAQ and Vitacost stockholders held illiquid shares of uncertain legal status. Pursuant to the settlement, the Court entered an Order which: (i) confirmed the number of shares in the Company based on the number of outstanding shares in the Company's initial public offering in 2009 (in effect, 'quieting title' to Vitacost shares), thus reassuring Vitacost stockholders and the market that Vitacost's outstanding shares and options were valid; and (ii) deemed Vitacost's certificate of incorporation to be valid and effective.  In the absence of this settlement, Vitacost could not have become 'current' with respect to its historical financial statements, its stock could not have resumed trading, and Vitacost would have almost certainly been forced to file for bankruptcy.  This settlement was unprecedented and historic, and, in essence, saved Vitacost and the equity interests of its stockholders.

In short, the stellar legal talent of the Weiser Firm dictates that it is amply qualified and the best-suited to serve as lead counsel in the Action.

Finally, as discussed in the Robinson Motion, the Robinson Trust has selected Strauss Troy to serve as liaison counsel.  Strauss Troy is a well-known and talented law firm that regularly appears in this Court, maintains offices in Ohio, and will be able to efficiently communicate with the Court and all parties as liaison counsel.[34]

Indeed, Strauss Troy is highly experienced in prosecuting stockholder derivative claims, and has achieved notable results, in particular, within the field of 'say on pay' derivative

---

[34] A copy of Strauss Troy's firm resume is attached as Exh. 'G' to the Stecker Decl.

litigation.[35] Most recently, in the *Cincinnati Bell* case, Strauss Troy served as one of counsel for the plaintiffs and negotiated a settlement which secured substantial corporate governance reforms related including but not limited to: (i) reaffirmation of Cincinnati Bell's 'pay for performance' philosophy of compensation for its most senior executives; (ii) appointment of an independent compensation consultant in connection with the calculation of compensation for its most senior executives; and (iii) rotation of the members of its board of directors serving on the board's compensation committee. Strauss Troy has also been counsel for plaintiffs in a number of other prominent shareholder derivative actions.[36]

Accordingly, Strauss Troy is best-suited to serve as liaison counsel in the Action.

## III.    CONCLUSION

For the foregoing reasons, the Court should consolidate the Actions, appoint the Robinson Trust as Lead Plaintiff, the Weiser Firm as Lead Counsel, and Strauss Troy as Liaison Counsel.

Dated: August 31, 2012                              Respectfully Submitted,

                                                    STRAUSS TROY


                                                     /s/  Richard S. Wayne
                                                    Richard S. Wayne (Ohio Atty. #0022390)
                                                    Thomas P. Glass (Ohio Atty. #0062382)
                                                    150 E. Fourth Street
                                                    Cincinnati, OH 45202-4018
                                                    Telephone: (513) 621-2120
                                                    Facsimile: (513) 629-9426
                                                    Email: *rswayne@strausstroy.com*
                                                    Email: *tpglass@strausstroy.com*

                                                    Proposed Liaison Counsel

---

[35] *See In re Cincinnati Bell Deriv. Litig.*, No. A1105305 (Ohio Com. Pleas, Hamilton Cnty.).

[36] *See, e.g., Delduco v. Boykin Lodging Co*., No. CV-06-59403 (Ohio Com. Pleas, Cuyahoga Cnty.); *IT Litig. Trust, et al v. D'Aniello*, No. 02-10118 (D. Del.); and *Austern Trust v. Forster*, No. A0207067 (Ohio Com. Pleas, Hamilton Cnty.).

THE WEISER LAW FIRM, P.C.
Robert B. Weiser
Christopher L. Nelson
Brett D. Stecker
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

Proposed Lead Counsel


LAW OFFICE OF ALFRED G. YATES, JR., P.C.
Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033

Counsel for The Robinson Trust


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been filed electronically with the U.S. District Court this 31st day of August, 2012.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  If a party is not given notice electronically through the Court's system a copy will be served by ordinary United States mail, first class postage prepaid, this 31st day of August, 2012.


/s/  Richard S. Wayne
Richard S. Wayne (Ohio Atty. #0022390)


045688.957.3057171_1.DOC

- 16 -