### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| THE ROBINSON FAMILY TRUST, derivatively on behalf of FIRSTMERIT CORPORATION, | : : : : | Civil Action No. 5:12-cv-1713 |
| Plaintiff, | : : | |
| v. | : | |
| PAUL G. GREIG, TERRENCE E. BICHSEL, WILLIAM P. RICHGELS, DAVID G. GOODALL, LARRY A. SHOFF, STEVEN H. BAER, R. CARY BLAIR, ROBERT W. BRIGGS, KAREN S. BELDEN, JOHN C. BLICKLE, RICHARD COLELLA, GINA D. FRANCE, J. MICHAEL HOCHSCHWENDER, TERRY L. HAINES, CLIFFORD J. ISROFF and PHILIP A. LLOYD II, | : : : : : : : : : : : | **JURY TRIAL DEMANDED** |
| Defendants, | : : | |
| and | : | |
| FIRSTMERIT CORPORATION, | : : | |
| Nominal Defendant. | : | |

### AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      This is a consolidated shareholder derivative action on behalf of nominal defendant FirstMerit Corporation ("FirstMerit" or the "Company") against certain current and/or former members of FirstMerit's Board of Directors (the "Board") and executive officers.  This action seeks to hold Defendants (defined herein) liable for breach of their fiduciary duties of good faith and loyalty, unjust enrichment and aiding and abetting from 2011 to the present (the "Relevant Period") in connection with the award of excessive and unwarranted 2011 executive compensation.

### NATURE OF THE ACTION

2.      This is a failed "say on pay" shareholder derivative action, arising from the Board's

unwarranted and excessive spending of Company (*i.e.*, stockholders') funds on executive compensation -- namely, the Board's recent authorization of excessive 2011 compensation for executives who have presided over extremely disappointing Company (and stock) performance.  In particular, the 2011 executive compensation awarded to top FirstMerit executives totaled over $12.1 million, including over $6.63 million for FirstMerit's Chairman, President and Chief Executive Officer ("CEO"), defendant Paul G. Greig ("Greig").  Greig's 2011 compensation represented a 16% increase over his compensation for 2010, in the face of FirstMerit's share price decline of over 20% in 2011.

3.     Defendants compounded their breach by simultaneously issuing materially false statements to FirstMerit shareholders in an attempt to create the illusion that they complied with their own compensation policy.  Indeed, Defendants, and, in particular, the Board's Compensation Committee (the "Compensation Committee") have represented publicly that the Board's executive compensation practices are rooted in a purported pay-for-performance policy, which is dependent upon long-term Company performance and long-term shareholder return.

4.     For example, in the Company's Proxy Statement filed with the Securities and Exchange Commission ("SEC") on Form DEF 14A and disseminated to FirstMerit stockholders on March 8, 2012 (the "Proxy"), the Board claimed that its executive compensation policy encompasses "performance-based, at-risk pay components aligned to strategic and financial performance objectives and risk mitigation and retention related components.  Pay elements are specifically designed to encourage and reward the achievement of our long-term interests and *the creation of long-term shareholder value*. . . . Ultimately, the Compensation Committee's goal is to structure a program that promotes our long-term success and provides an optimal long-term value creation scenario for our shareholders . . ."  Stated another way, based on Defendants' own public statements,

the Company's executives should receive enhanced compensation only if they create meaningful and long-term performance for FirstMerit stockholders.

5.     Here, the Board awarded excessive 2011 executive compensation, particularly to defendant Greig, despite the fact that doing so contradicted the Company's own compensation policy, a majority vote of FirstMerit shareholders, and the opinions of industry analysts and experts.

6.     First, in the five years leading up to and through 2011, the price of the Company's stock was in decline.  Between January 3, 2007 and December 30, 2011, the price of the Company's stock dropped from $24.20 per share to $16.76 per share.   At the same time, the Company's five-year total "shareholder return," which was essentially the total shareholder return for Greig's entire tenure as CEO, was *negative 19.4%*.  Indeed, with Greig at the helm of FirstMerit, the Company's stock price fell by approximately 20% in 2011 alone.  Notwithstanding the foregoing, during that five-year period Greig's compensation *doubled* from $3.3 million in 2007 to $6.6 million in 2011.  Greig's 2011 compensation – *awarded in the face of a five-year decline in the Company's stock price and shareholder return* – is utterly at odds with the Company's "pay for performance" compensation policy, under which awards are supposedly based on the Company's "long-term interests and the creation of long-term shareholder value."

7.     Second, both FirstMerit shareholders and independent experts have voiced their clear opposition to Greig's 2011 compensation.  On March 24, 2012, ISS Proxy Advisory Services ("ISS")[1] issued a report (the "ISS Report") in which it advised FirstMerit shareholders to vote against the Board-recommended executive compensation proposal because it believed that the

---

[1] ISS is one of the world's leading proxy advisory services, and advises in connection with approximately one-half of the world's common stock.   *See*   http://business-ethics.com/2010/05/17/243-proxy-advisors-find-themselves-in-the-spotlight/ Current as of October 31, 2012.

Board's proposed 2011 executive compensation was in violation of the Company's pay for performance policy, as well as the Board's own public statements, and that it was not in the best interests of FirstMerit stockholders.

8.     On April 18, 2012, the Company held its "say on pay" vote regarding the executive compensation proposed by the Board. In the Proxy issued in connection with that vote, the Board unsurprisingly recommended that FirstMerit shareholders should approve the Board's 2011 executive compensation program and the excessive compensation (including the material pay increase for Greig), despite the fact that Defendants had obviously not delivered any short-term Company performance *or* any long-term performance to shareholders whatsoever. Nonetheless, a majority of voting FirstMerit stockholders disagreed with the Board and *rejected* its business judgment on 2011 executive compensation. The vote was 47,183,967 against the compensation recommendation, and 41,161,172 for the compensation recommendation. Clearly, FirstMerit shareholders concluded that 2011 compensation increases were not in the Company's best interests, and that the Board was not paying for performance, as it had promised shareholders it would.

9.     The significance and rarity of FirstMerit shareholders' rejection of the Company's proposed 2011 executive compensation cannot be overstated. Through August 2012, only 2.6% of companies that conducted "say on pay" votes in 2012 have received – like FirstMerit – negative votes from shareholders rejecting proposed pay packages. In the simplest terms, negative say on pay shareholder votes are extremely rare, and occur in only those situations where the executive pay packages proposed by a board of directors represent, at minimum, a reckless disregard by the board for the best interests of the corporation.

10.    Here, not only did the Board recklessly disregard the best interests of the Company, it brazenly did so in the face of the will of the Company's shareholders. It did not rescind the

excessive 2011 executive compensation, and it has never provided any explanation for its failure to do so. Nor has it indicated that it will. Because of the Board's actions, the Company's "say on pay" vote was a sham. The Board's 2011 executive compensation decision was unreasonable, disloyal, lacked good faith, and violated the Board's pay-for-performance executive compensation policy, which was supposed to hinge upon "the creation of long-term shareholder value."

11. The conclusion that the Board breached its fiduciary duties is supported by the facts that: (a) a majority of the Company's stockholders voted that the 2011 executive compensation was not in the Company's or their best interests, and (b) the Board has yet to respond to the majority will of the Company's stockholders (nor indicated that it will) in any way, even though the negative shareholder vote occurred seven months ago. By falsely claiming that the Board paid for performance and that the Company's executive officers would be rewarded for Company performance, defendants also breached their fiduciary duties.

12. For all of these reasons, the Board cannot now hide behind the so-called "business judgment rule," which is a summary judgment stage or trial stage defense, and which is only available to faithful fiduciaries. Based on the particularized facts alleged herein, Plaintiff (and the majority of the Company's voting stockholders) has cast doubt on the Board's decision-making, as well as the accuracy and truthfulness of its public statements, and accordingly, this derivative action on behalf of the Company should proceed.

13. By this shareholder derivative action, Plaintiff seeks to recover damages and other relief on behalf of FirstMerit against Defendants for their breaches of fiduciary duties of candor, good faith, and loyalty, and for unjust enrichment. Absent this action, the majority will of the Company's stockholders shall be rendered meaningless, and the Company's rights against its wayward fiduciaries will not be exercised, to the further detriment of the Company.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein, including Defendants' participation in the wrongful acts detailed herein, occurred in this District and FirstMerit maintains its corporate headquarters in this District.  Further, Defendants either reside in or maintain executive offices in this District, and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

16.    Plaintiff, The Robinson Family Trust ("Plaintiff"), is a current shareholder of FirstMerit and has been continuously since 1988.  Plaintiff voted against the Board's 2011 senior officer compensation recommendation.

17.    Nominal defendant FirstMerit is an Ohio corporation with its executives offices located at III Cascade Plaza, 7th Floor, Akron, Ohio 44308.  According to its public filings, FirstMerit is a diversified financial services company, with assets of $14.7 billion as of March 31, 2012 and 205 banking offices and 213 ATMs in Ohio, Western Pennsylvania, and Chicago, Illinois areas.  FirstMerit provides a complete range of banking and other financial services to consumers and businesses through its core operations.  Principal wholly-owned subsidiaries include: FirstMerit Bank, N.A. (the "Bank"), FirstMerit Mortgage Corporation, FirstMerit Title Agency, Ltd., and FirstMerit Community Development Corporation.

18.    Defendant Greig has served as the Company's Chairman, President and CEO since

2006.  Greig also serves as the Chairman, President and CEO of the Bank.

19.     Defendant Terrence E. Bichsel ("Bichsel") has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since 1999.  In addition, Bichsel serves as Executive Vice President and CFO of the Bank.

20.     Defendant David G. Goodall ("Goodall") has served as the Company's Executive Vice President, Commercial Banking since September 2009.  Defendant Goodall joined the Company in March 2009 as its Head of Specialized Banking.

21.     Defendant William P. Richgels ("Richgels") has served as the Company's Executive Vice President and Chief Credit Officer since 2007.

22.     Defendant Larry A. Shoff ("Shoff") has served as the Company's Executive Vice President and Chief Information Officer, and as the Executive Vice President and Chief Technology Officer of the FirstMerit Services Division, since 1999.

23.     Defendant Steven H. Baer ("Baer") has served as a director of the Company since 2007.

24.     Defendant R. Cary Blair ("Blair") has served as a director of the Company since 1996.  In addition, defendant Blair served as Chairman of the Compensation Committee during the Relevant Period, and continues to serve as Chairman of the Compensation Committee.

25.     Defendant Robert W. Briggs ("Briggs") has served as a director of the Company since 1996.

26.     Defendant Karen S. Belden ("Belden") has served as a director of the Company since 1996.

27.     Defendant John C. Blickle ("Blickle") has served as a director of the Company since 1990.  In addition, defendant Blickle served as a member of the Compensation Committee during the

Relevant Period.

28.      Defendant Richard Colella ("Colella") has served as a director of the Company since 1998.

29.      Defendant Gina D. France ("France") has served as a director of the Company since 2004.

30.      Defendant J. Michael Hochschwender ("Hochschwender") has served as a director of the Company since 2005.  In addition, defendant Hochschwender served as a member of the Compensation Committee during the Relevant Period.

31.      Defendant Terry L. Haines ("Haines") has served as a director of the Company since 1991.  In addition, defendant Haines served as a member of the Compensation Committee during the Relevant Period.

32.      Defendant Clifford J. Isroff ("Isroff") has served as a director of the Company since 1981 and as the Board's Lead Independent Director since 2003.  In addition, defendant Isroff served as a member of the Compensation Committee during the Relevant Period.

33.      Defendant Philip A. Lloyd II ("Lloyd") has served as a director of the Company since 1988.  In addition, defendant Lloyd served as a member of the Compensation Committee during the Relevant Period.

34.      Defendants Greig, Bichsel, Goodall, Richgels, Shoff, Baer, Blair, Briggs, Belden, Blickle, Colella, France, Hochschwender, Haines, Isroff and Lloyd shall be collectively referred to herein as "Defendants."

35.      Defendants Blair, Blickle, Hochschwender, Haines and Isroff shall be collectively referred to herein as the "Compensation Committee Defendants."

## THE DUTIES OF FIRSTMERIT'S DIRECTORS AND OFFICERS

36.      As  directors  and  officers  of  FirstMerit,  Defendants  owed  FirstMerit  and  its

shareholders an unremitting duty of loyalty that requires directors and officers to put the best interests of FirstMerit's shareholders ahead of their own personal interests and the interests of FirstMerit's corporate managers at all times.  Directors who fail to act in shareholders' best interests breach their fiduciary duty of loyalty and may be held liable for damages.  A claim for a breach of the duty of loyalty is, as a matter of law, non-exculpable.

37.     Because of their executive and directorial positions with FirstMerit, Defendants knew or should have known that by increasing 2011 executive compensation despite the plummeting value of FirstMerit's stock, they were breaching their fiduciary duties of good faith, loyalty and reasonableness owed to FirstMerit, as well as unjustly enriching certain of the Company's senior officers.  Defendants also knew or should have known that by unanimously recommending shareholder approval of the 2011 executive compensation in the Proxy, they were breaching their fiduciary duties of good faith and loyalty and violating the Board's purported pay-for-performance executive compensation policy.  There is doubt that those decisions were presumptively protected business judgments, and that the Board acted loyally in making these business judgments.

38.     Because of their executive and directorial positions with FirstMerit, Defendants also knew or should have known that the Proxy's (and other Company SEC filings') repeated representations that the Board pays for performance were false and misleading.  By causing such statements to be made, the Defendants were breaching their fiduciary duties of loyalty and good faith owed to FirstMerit and its shareholders, and these actions do not qualify for protection under the business judgment rule.  The 2011 executive compensation increases were inconsistent with the Board's stated pay-for-performance policy and Defendants' repeated statements to the contrary were designed to and did conceal the fact that the Board was overpaying the Company's executive officers via compensation plans premised on an illusory pay-for-performance policy.

39.     At times relevant hereto, Defendants were the agents of each of the other Defendants and were at all times acting within the course and scope of such agency.

40.     Pursuant to the Company's Compensation Committee charter, the Compensation Committee Defendants were specifically obligated, *inter alia*, to:

(a)     Establish, in consultation with senior management, the Company's general compensation philosophy, and oversee the development and implementation of compensation programs;

(b)     Review and approve corporate and individual goals relevant to CEO compensation, administer the performance evaluation of the CEO by the Board and recommend to the Board the CEO's compensation level based on this evaluation. In recommending the long-term incentive component of the CEO compensation, the Committee shall consider the Company's performance and *relative shareholder return*, the value of similar incentive awards to CEO's at comparable companies and past awards given to the CEO;

(c)     Make recommendations to the Board with respect to the Company's non-sales based incentive compensation plans and equity based plans, oversee the activities of the committees responsible for administering these plans and discharge any responsibilities imposed on the Committee by any of these plans; and

(d)     Review and approve for the CEO and executive officers of the Company (i) annual base salary level, (ii) annual incentive opportunity level, (iii) long-term incentive opportunity level, (iv) employment agreements, severance arrangements, change in control or similar termination agreements, and (v) other special or supplemental benefits.

## AIDING AND ABETTING AND CONCERTED ACTION

41.     In committing the wrongful acts particularized herein, Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

10

42.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs detailed herein.  In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his, her, or its overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

43.     According to its public filings, FirstMerit is a diversified financial services company, with assets of $14.7 billion as of March 31, 2012 and 205 banking offices and 213 ATMs in Ohio, Western Pennsylvania, and Chicago, Illinois areas.  FirstMerit provides a complete range of banking and other financial services to consumers and businesses through its core operations.  Principal wholly-owned subsidiaries include the Bank, FirstMerit Mortgage Corporation, FirstMerit Title Agency, Ltd., and FirstMerit Community Development Corporation.

44.     Throughout the Relevant Period, the Board (and particularly, the Compensation Committee) overcompensated FirstMerit's senior executives irrespective of the Company's actual performance, despite the Board's stated pay-for-performance policy, which purportedly hinged upon Company performance and the creation of long-term shareholder value.  Here, the Board is directly responsible for the clear disconnect between management and stockholder interests.

**The Board's Purported "Pay-For-Performance" Policy**

45.     Defendants have represented that the Board's executive compensation practices are firmly rooted in a pay-for-performance policy.  For example, in the Proxy, the Board stated that its executive compensation policy is designed "to encourage and reward the achievement of our long-term interests and the creation of long-term shareholder value."  Additionally, the Board stated that its executive compensation policy is structured to promote "our long-term success and provides an optimal long-term value creation scenario for our shareholders."  Thus, under the Company's

executive compensation policy, the Company's executives should receive enhanced compensation only if they create positive long-term performance for FirstMerit and its stockholders.

46.     Here, and as set forth in more detail, below, during the entirety of Greig's tenure as FirstMerit's CEO, the Company did not experience positive long-term performance.  Nor did it even experience positive performance during 2011.

**FirstMerit's Financial Performance**

47.     During 2011, FirstMerit's shares lost *over 20%* of their value.  On December 31, 2010, FirstMerit shares closed at $19.79 per share.  In 2011, the price of FirstMerit stock fell to as low as $10.31 per share, and closed on December 30, 2011 at $16.76 per share.  The Company's 2011 performance rounded-out *five years* of negative performance for FirstMerit.

48.     Specifically, for the five-year period from 2007 through 2011, the Company's total shareholder return (which was, essentially, the total shareholder return for Greig's entire tenure as CEO) was *negative 19.4%.*

49.     During the same time period, the price of the Company's stock fared no better.  Instead, from January 3, 2007 to December 30, 2011, the price of the Company's stock declined from $24.20 to $16.76 per share – a decline of approximately 31%.

**2011 Executive Compensation**

50.     For 2011, FirstMerit's five highest-paid officers -- defendants Greig, Bichsel, Richgels, Goodall and Shoff -- collectively received over *$12.1 million* in executive compensation.  Greig alone received a 16% year-over-year raise.

51.     That compensation decision flies in the face of the Company's stated pay-for-performance policy, which was, supposedly, based upon Company performance and "long-term shareholder value."  Indeed, neither goal was achieved; over the last five years both the Company's stock price and total shareholder return have materially declined.

**A Majority of FirstMerit's Shareholders Reject the Board's Business Judgment**

52.     Fortunately for the Company's shareholders, on March 8, 2012, a "say on pay" vote was conducted via the Proxy, whereby FirstMerit shareholders were given the chance to voice their dissatisfaction with the Board's clear disregard for their interests, the Board's own prior statements regarding its pay-for-performance compensation policy, and the Board's apparent refusal to acknowledge the Company's dreadful performance in determining executive compensation for 2011. The Company's stockholders were thus afforded the opportunity to vote on whether, as the Board claimed, the interests of FirstMerit's executive officers' interests were in fact aligned with those of long-term shareholders.

53.     Prior to the Company's 2011 say on pay vote, the Board published the Proxy, wherein it "recommended" to FirstMerit shareholders that they should approve FirstMerit's 2011 executive compensation, stating:

> The Board of Directors unanimously recommends a vote "for" approval, on an advisory basis, of the compensation of FirstMerit's named executive officers.

54.     In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") was enacted to require certain public companies to submit executive compensation plans to a shareholder vote, widely known as a "say on pay" vote. *See e.g.* 15 U.S.C. Section 78n-1.[2] Congress intended Dodd-Frank's say-on-pay vote to function as a referendum on whether the executive compensation awarded was in the best interests of shareholders. *See* S. Rep.

---

[2] Title IX of the Dodd-Frank Act, known as the Investor Protection and Securities Reform Act of 2010, contains the "say-on-pay" provisions at Subtitle E (Accountability and Executive Compensation), Section 951, requiring, among other things, that "[n]ot less frequently than once every 3 years, a proxy or consent or authorization for an annual or other meeting of the shareholders for which the proxy solicitation rules of the Commission require compensation disclosure shall include a separate resolution subject to shareholder vote to approve the compensation of executives . . ."

No. 111-176, at 133 (2010) ("shareowner votes on pay [were meant to] serve as a direct referendum on the decisions of the compensation committee and [] offer a more targeted way to signal shareowner discontent than withholding votes from committee members."). Indeed, according to a Senate Banking Report, the purpose of the Dodd-Frank Act's say-on-pay vote is to provide an efficient means for shareholders, as the owners of a corporation, to collectively express whether the corporation's executive compensation is in their best interests as shareholders. *See* S. Rep. No. 111-76, at 133.

55.     Notably, since Dodd-Frank was enacted, negative "say on pay" votes on executive compensation have been extremely rare. For instance, out of the 2,025 "say on pay" votes conducted from January 2012 through August 2012, only 53 companies – approximately 2.6% – received majority negative votes from shareholders rejecting proposed pay packages.[3] Similarly, of the 1,913 "say on pay" votes conducted during 2011, only 30 companies – approximately 1.56% – had negative votes rejecting proposed pay packages.[4] Indeed, just 2% of businesses operating within the financial sector received negative "say on pay" votes during 2011. *Id.* Thus, shareholders have almost uniformly supported companies' pay programs.

56.     FirstMerit shareholders, however, have notably disapproved of and opposed the Board's 2011 compensation decisions. On April 17, 2012, a majority of FirstMerit's voting shareholders resoundingly ***rejected*** the Board's business judgment and its executive compensation decision. Specifically, only 46% of FirstMerit shareholders supported the proposed compensation package. This represented a marked and radical change from the prior year, where approximately

---

[3] *See* http://www.semlerbrossy.com/wp-content/uploads/2012/09/SBCG-SOP-2012-09-05.pdf.

[4] *Id.*

87% of FirstMerit shareholders supported the Board's proposed 2010 executive compensation package.

57. For several reasons, this result came as no surprise (or should have come as no surprise) to the Board. First, in the ISS Report issued on March 24, 2012 (in advance of the vote), ISS issued a recommendation advising FirstMerit shareholders to vote against the Board-recommended executive compensation proposal. Clearly, ISS believed that the Board's proposed 2011 executive compensation was in violation of the Company's pay for performance policy, as well as the Board's own public statements, and that it was not in the best interests of FirstMerit stockholders.

58. In the ISS Report, citing the Company's dreadful long-term total shareholder returns (or, to be more precise, the lack thereof) and the Board's lack of fulsome disclosures regarding pay determinations in light of the same, ISS found that there was a "*pay for performance disconnect*" at FirstMerit, and further compared defendant CEO Greig's total compensation to the compensation granted to the CEOs in a peer group of 24 companies in FirstMerit's industry. Greig's total compensation for 2011 was *2.27 times higher* than the median total compensation paid to the CEOs in the peer group. The ISS Report recommended that FirstMerit shareholders vote *against* the Board's proposed 2011 executive compensation for a number of reasons, including:

> *Given the misalignment between CEO compensation and TSR [total shareholder return] performance, both relative to peers and on an absolute basis, the lack of disclosure on how maximum bonus payout is justified in light of the company's performance and the continuing grant of time-based equity awards, suggest that a pay-for-performance disconnect exists at this time.* Shareholders should note that CEO's 2011 pay of $6.4 million is three times the level of the second highest paid executive. Such significant internal pay disparity among the executive ranks may be a sign of weak succession planning.[5]

---

[5] Following publication of the ISS Report, on March 29, 2012, Defendants published and filed with the SEC a "Management Say on Pay Proposal Presentation" in which the Board attempted to defend

59.     The very reasons cited by the ISS for voting against the Board's proposed 2011 executive pay package, notably, underlie this action.  Thus, there is reason to doubt for pleading purposes that the Board's decision to increase 2011 compensation was a protected business judgment and that the Board acted loyally in awarding 2011 compensation.

60.     In an attempt to publicly justify their decision to lavish upon Greig yet another pay raise for 2011, the Board stated that the Company had increased net income for 2011 by 16% over the prior year, increased total 2011 commercial loan production by 38% over 2010, increased 2011 "core" deposits by 14% over 2010, decreased charge-offs from 1.23% in to 2010 to .85% in 2011, and continued a trend of "Superior Relative Stock Performance" versus their competitors.  But, this violates the very heart of the Company's pay-for-performance policy, which required the Board not to reward short-term performance, but rather, "to encourage and reward the achievement of [FirstMerit's] long-term interests and the creation of long-term shareholder value" through the creation of "long-term value" for the Company.

61.     Further, the Board was deeply involved in selecting the "peer" companies and CEOs against which Greig's compensation was measured and made those selections to justify Greig's compensation.  For example, for 2011, the Board selected 11 "peer" companies for the purposes of CEO compensation.  Of those 11 companies, less than half, only 5, had been included in FirstMerit's "peer" group for the prior year.  Similarly, in 2011, the Board selected 10 companies against which to compare FirstMerit's overall performance for the purposes of setting Greig's compensation.  Of those 10 companies, less than half, only 4, had been included in FirstMerit's "peer" group for company performance in 2010.

---

and rehabilitate its 2011 executive compensation proposal in advance of the "say on pay" vote. Obviously, FirstMerit shareholders were not fooled.

62.     The dramatic changes from 2010 to 2011 in the Board's selection of FirstMerit's "peer" companies was critically important: by controlling and altering the composition of FirstMerit's "peer" group, Defendants were able to generate the appearance of superior performance in certain financial metrics relative to the Company's peers.  For example, if the Company had maintained the same peer group in 2011 as it had in 2010, it would have been ranked: (i) 7th among its "peers" in return on equity, instead of 2nd; and (ii) 10th among its "peers" in loan net charge offs, instead of 3rd.  Thus, by changing the composition of the Company's "peer" group from year-to-year, the Board was able to (at least partially) create the appearance that the Company's performance in key metrics was improving, thus justifying increased compensation for Greig.

63.     Notwithstanding the Board's sleight-of-hand and attempts to undermine the ISS Report, FirstMerit shareholders and other proxy advisory services picked up on and rejected the Board's machinations.

64.     For example, Semler Brossy, a well-known and leading independent executive compensation consulting firm, sharply criticized FirstMerit's proposed 2011 compensation package and explained that the negative shareholder vote was due to: (i) the failure of the Board and Compensation Committee to tie executive pay to performance; (ii) a substantial increase in executive compensation on a year-over-year basis; (iii) insufficient rigor in FirstMerit's performance goals; (iv) non-performance based equity compensation; (v) shareholder and outreach disclosures; and (vi) other problematic pay practices at FirstMerit.[6]

65.     Notwithstanding the foregoing, the Board has taken no meaningful action or issued

---

[6] *See Semler Brossy*, 2012 Say On Pay Results, September 5, 2012, http://www.semlerbrossy.com/. Semler Brossy further noted that the failed vote was likely due to an increase in Greig's compensation year-over-year, along with concerns over existing tax gross-ups and internal pay equity at FirstMerit.

any substantive response to the negative vote, which is in itself a separate and distinct breach of fiduciary duty.

66.     Further, and in any case, the Board members have breached their fiduciary duties by materially increasing 2011 executive compensation for defendant Greig in the immediate wake of the plummeting value of FirstMerit stock and falling revenues, after claiming to adhere to a pay-for-performance policy based on Company performance and long-term stockholder interests.  The inference that the Board breached its fiduciary duties is supported by the facts that: (1) a majority of the Company's stockholders voted that 2011 executive compensation was not in their best interests; and (2) the Board has failed to respond to the negative vote in any meaningful or substantive way. By falsely claiming that the Board paid for performance and that the Company's executive officers would be rewarded for delivering Company performance, the Board also breached its fiduciary duties by issuing a series of materially misleading statements.

67.     Thus, there is reason to doubt that the Board's actions and public representations were taken or made loyally, and/or in good faith, and/or are entitled to the presumptive protections of the business judgment rule.

## DAMAGES TO FIRSTMERIT

68.     FirstMerit has been damaged by the Board's awards of unwarranted, outsized executive compensation.  During 2011, the Company's stock price plummeted by over 20%, and at the time the Proxy was issued, the Company's five year total shareholder returns amounted to *negative 19.4%*, and yet, incredibly, 2011 executive compensation for the Company's CEO (defendant Greig) increased by 16%, in direct violation of the Board's purported "pay-for-performance" compensation policy.

69.     When given the opportunity to offer their own independent judgment of the Board's award of 2011 executive compensation, a majority of FirstMerit's voting shareholders firmly

rejected the 2011 executive compensation (and rightfully so). Yet, even in the face of this visceral reaction by FirstMerit's shareholders, the Board has not altered or amended the 2011 compensation, to the detriment of the Company and its stockholders. In fact, the Board has done nothing in response to the negative vote. By contract, the FirstMerit executives who received the excessive 2011 compensation have been unjustly enriched.

70.    By this derivative action, Plaintiff seeks to recover damages and other relief for FirstMerit against Defendants for their breaches of fiduciary duties of candor, good faith and loyalty, and for unjust enrichment. Absent this action, as the Board has already amply demonstrated, the majority will of the Company's stockholders shall be rendered meaningless and the Company's rights against its wayward fiduciaries will not be exercised to the further detriment of the Company.

## DEFENDANTS CAUSED FIRSTMERIT TO ISSUE THE MATERIALLY FALSE AND MISLEADING PROXY

71.    During the Relevant Period, Defendants caused FirstMerit to disseminate to shareholders the Proxy in connection with the Company's annual shareholder meeting. Defendants drafted, approved, reviewed and/or signed the Proxy before it was filed with the SEC and disseminated to FirstMerit shareholders. Defendants knew, or were deliberately reckless in not knowing, that the Proxy was materially false and misleading.

72.    In particular, in the Proxy, the Board claimed that its executive compensation practices aligned management/stockholder interests because it paid for performance and the Company's executives would receive enhanced compensation only if they achieved increases in Company performance, which rewarded the achievement of long-term interests and the creation of shareholder value.

73.    Defendants' statements in the Proxy were false and misleading, because even though the Company's stock price fell dramatically in 2011 and the value of the Company's stock has

eroded, defendant Greig's total compensation has increased 16% from 2010 to 2011. Accordingly, the Proxy clearly contained the false and misleading statements that the Board allegedly "paid for performance."

## DERIVATIVE AND DEMAND ALLEGATIONS

74.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

75.     Plaintiff brings this action derivatively on behalf of FirstMerit to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of Defendants' misconduct. Plaintiff is a current holder of FirstMerit common stock and will adequately represent the interests of the Company in this litigation. Plaintiff has retained counsel experienced in litigating this type of action.

76.     The Board is currently comprised of the following twelve (12) directors: defendants Greig, Baer, Blair, Briggs, Isroff, Belden, Blickle, Colella, France, Hochschwender, Haines and Lloyd.

77.     There is doubt that the Board's decision to award the 2011 executive compensation, which resulted in (among other things) a 16% raise for defendant Greig, was a protected business judgment, which excuses demand. The Board claimed that its executive compensation practices aligned management/stockholder interests because it paid for performance and the Company's executives would receive enhanced compensation only if they achieved increases in Company, which benefitted "long-term shareholder interests" and created "long-term shareholder value." Based on these representations (among others), a majority of the Company's stockholders rejected the Board's 2011 executive compensation recommendation. These undisputed facts raise doubt that the Board's 2011 compensation decision was a protected business judgment. Thus, demand is excused.

78.     A majority of the Board is interested in a demand because there is substantial

likelihood that they will be held liable for their conduct. In particular, the Board claimed that its executive compensation practices aligned management/stockholder interests because it paid for performance and the Company's executives would receive enhanced compensation only if they achieved increases in Company performance, which benefited "long-term shareholder interests" and created "long-term shareholder value." Therefore, executives should only receive enhanced compensation if long-term shareholder returns were delivered to FirstMerit stockholders. Based on these representations (among others), a majority of the Company's stockholders rejected the Board's 2011 executive compensation recommendation, and the Board has failed to meaningfully respond to the negative vote. These undisputed facts raise doubt that a majority of the Board complied with their fiduciary duties of loyalty and good faith. Thus, demand is excused.

79. There is doubt that the Board's decision to issue false and misleading statements regarding its purported "pay-for-performance" policy was a protected business judgment, which excuses demand. In particular, the Board claimed that its executive compensation practices aligned management/stockholder interests because it paid for performance and the Company's executives would receive enhanced compensation only if they achieved increases in Company performance, the Company's executives would receive enhanced compensation only if they achieved increases in Company performance, which benefited "long-term shareholder interests" and created "long-term shareholder value." Despite this representation, even though the Company's stock price materially declined in 2011 and the five-year total shareholder return at the time the Proxy was issued was negative 19.4%, the Board still awarded the enhanced 2011 executive compensation, in direct contravention of their previously stated "pay-for-performance" policy. The Board's false and misleading statements raise doubt that they are entitled to the protections of the business judgment rule. Thus, demand is excused.

80.     The entire Board is interested in a demand because there is substantial likelihood that they will be held liable for their conduct.  In particular, the Board claimed that its executive compensation practices aligned management/stockholder interests because it paid for performance and the Company's executives would receive enhanced compensation only if they achieved increases in Company performance, which benefited "long-term shareholder interests" and created "long-term shareholder value."  Despite this representation, even though the Company's stock price materially declined, the Board still awarded the enhanced executive compensation, in direct contravention of their previously stated "pay-for-performance" policy.  Accordingly, the Board's false and misleading statements raise doubt that the entire Board complied with their fiduciary duties of loyalty and good faith.  Because the entire Board faces a substantial likelihood of liability in connection with the issuance of false and misleading statements,  demand is excused.

81.     A pre-suit demand is excused because the entire Board devised the illicit compensation, approved the illicit compensation, recommended publicly that FirstMerit's shareholders unanimously approve FirstMerit's 2011 executive compensation (including material pay increases for FirstMerit's CEO), and suffered a negative shareholder vote on the compensation. On April 18, 2012, a majority of voting FirstMerit stockholders *rejected* the Board's 2011 senior officer compensation recommendation.   The vote was 47,183,967 against the compensation recommendation, and 41,161,172 for the compensation recommendation.  Yet, the Board has not altered or otherwise amended the 2011 executive compensation, nor indicated that it has any intention of doing so.  By first recommending that the Company's stockholders approve the excessive 2011 executive compensation, and then failing to take any action whatsoever in the face of the adverse stockholder vote, the Board has openly demonstrated its hostility to this action and that a pre-suit demand upon it to take such action is a useless and futile act.  All members of Board face a

substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile since there is reason to doubt that these same directors could exercise their independent business judgment over whether to bring suit against themselves for breach of fiduciary duty in awarding the challenged compensation.

82.    Pre-suit demand on defendant Greig is excused because his principal professional occupation is his employment as President and CEO of FirstMerit.  In addition, Defendants have admitted in the Proxy that defendant Greig is not independent.  Accordingly, defendant Greig has received and continues to receive substantial monetary compensation and other valuable benefits (including the excessive compensation complained of herein).  Thus, defendant Greig lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  Moreover, as alleged herein, Greig received excessive and unwarranted executive compensation in 2011, and, as a result, was the direct recipient of financial benefits from the misconduct challenged herein that were not shared with FirstMerit's stockholders. Thus, Greig is also directly interested in a demand, and accordingly, pre-suit demand upon Greig is excused.

83.    Pre-suit demand on defendant Baer is excused because Baer receives substantial monetary compensation from FirstMerit in connection with his role as a member of the consulting firm Rally Capital Services, LLC ("Rally Capital").  Specifically, the Bank paid fees to Rally Capital which, during 2011, exceeded 5% of Rally Capital's annual consolidated gross revenues.  This raises doubt that Baer could respond to a shareholder demand independently and in good faith, and accordingly, Defendants have admitted in the Proxy that defendant Baer is not independent.  Indeed, Defendants expressly concede that the fees paid by the Bank to Rally Capital "might interfere with [Baer's] exercise of independent judgment in carrying out his responsibilities as a director."  Thus,

defendant Baer lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

84.     Defendants Blair, Blickle, Hochschwender, Haines and Isroff are each interested in a demand as a result of their conduct on the Compensation Committee during the Relevant Period. Pursuant to the Company's Compensation Committee charter, directors on the Compensation Committee are responsible for, *inter alia*, reviewing and setting executive compensation in conformity with the Board's pay-for-performance executive compensation policy. Defendants Blair, Blickle, Hochschwender, Haines and Isroff each breached their fiduciary duties of due care, loyalty, and good faith, because the Compensation Committee, *inter alia*, devised, approved and awarded the above-discussed 2011 executive compensation, which was wholly divorced from the Board's pay-for-performance criteria. Therefore, defendants Blair, Blickle, Hochschwender, Haines and Isroff (if not the entire Board) each face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile since there is reason to doubt that these same directors could exercise their independent business judgment over whether to bring suit against themselves for breach of fiduciary duty in awarding the challenged compensation.

85.     A pre-suit demand is further excused because the entire Board either were at fault for the misconduct described herein and/or are liable for the misconduct described herein. As such, all Board members face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile since there is reason to doubt that these same directors could exercise their independent business judgment over whether to bring suit against themselves for breach of fiduciary duty in awarding the challenged compensation, and are disabled as a matter of law from objectively considering any pre-suit demand, rendering demand futile and excused.

## FIRST CAUSE OF ACTION
### Against Defendants for Breach of Fiduciary Duty in Connection For the Issuance of False and Misleading Statements

86.　　Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

87.　　Each of the Defendants was a director and/or officer of FirstMerit and as such owed to FirstMerit the highest duty known to the law.  Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these Defendants owed to FirstMerit.

88.　　As demonstrated by the allegations above, Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to FirstMerit and its shareholders, and failed to disclose material information and/or made material misrepresentations to shareholders regarding FirstMerit's 2011 executive compensation policy.

89.　　Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to FirstMerit and its shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of FirstMerit and its shareholders.  As directors and/or officers of FirstMerit, Defendants participated in the wrongful acts alleged herein.  They thereby breached their fiduciary duties to FirstMerit's shareholders.

90.　　As corporate fiduciaries, Defendants owed FirstMerit and its shareholders a duty of candor and full and accurate disclosure.  As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from FirstMerit's shareholders despite their duties to, *inter alia*, disclose the true facts regarding FirstMerit.  Thus they have violated their duty of candor.

91.　　In committing the wrongful acts particularized herein, Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in

25

furtherance of their common plan or design.

92.     At all relevant times, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was overpaying its officers via compensation plans premised on an illusory pay-for-performance executive compensation scheme; and (ii) maintain their directorial and executive positions at FirstMerit and the profits, power and prestige which they enjoyed as a result of these positions.

93.     In particular, in the Proxy, the Board claimed that its executive compensation practices aligned management/stockholder interests because it paid for performance and the Company's executives would receive enhanced compensation only if they achieved increases in Company performance, the design of which was "to encourage and reward the achievement of our long-term interests and the creation of long-term shareholder value."  Despite this (and other) representations, even though the Company experienced plummeting stock value and shareholders experienced negative long-term total shareholder returns, the Board still awarded excessive executive compensation, in direct contravention of their previously stated pay-for-performance policy.  Accordingly, it is clear that the Board's repeated statements that it pays for performance were false and misleading.

94.     Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

95.     By reason of the foregoing acts, practices and course of conduct, Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward FirstMerit and its public shareholders, harming FirstMerit.

### SECOND CAUSE OF ACTION
**Against Defendants for Breach of Fiduciary Duty in Connection with the Board's Compensation Practices**

96.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

26

97.     Each of the Defendants was a director and/or officer of FirstMerit and as such owed to FirstMerit the highest duty known to the law.  Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these Defendants owed to FirstMerit.

98.     As demonstrated by the allegations above, Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to FirstMerit and its shareholders by failing to adhere to the Company's purported pay-for-performance policy.  In particular, in the Proxy, the Board claimed that its executive compensation practices aligned management/stockholder interests because it paid for performance and the Company's executives would receive enhanced compensation only if they achieved increases in Company performance, the design of which was "to encourage and reward the achievement of our long-term interests and the creation of long-term shareholder value."  Despite this (and other) representations, even though the Company experienced plummeting stock value and shareholders experienced negative long-term total shareholder returns, the Board still increased executive compensation, in direct contravention of their previously stated pay-for-performance policy.  This increase in executive compensation in direct contravention of the Board's stated pay-for-performance policy was a breach of the Board's fiduciary duties.

99.     Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to FirstMerit and its shareholders, have engaged in unlawful self-dealing, and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of FirstMerit and its shareholders.  As directors and/or officers of FirstMerit, Defendants participated in the wrongful acts alleged herein.  They thereby breached their fiduciary duties to FirstMerit's shareholders.

100.    In committing the wrongful acts particularized herein, the Defendants have pursued

or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

101. Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

102. By reason of the foregoing acts, practices and course of conduct, Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward FirstMerit and its public shareholders, harming FirstMerit.

### THIRD CAUSE OF ACTION
**Against Defendants for Breach of Fiduciary Duty in Connection with the Failure to Respond to the Negative Say on Pay Vote**

103. Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

104. Each of the Defendants was a director and/or officer of FirstMerit and as such owed to FirstMerit the highest duty known to the law. Each of the Defendants agreed to and did participate in and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of the fiduciary duties these Defendants owed to FirstMerit.

105. As demonstrated by the allegations above, Defendants breached their fiduciary duties of loyalty, good faith, candor and independence owed to FirstMerit and its shareholders by failing to amend or alter 2011 executive compensation in connection with the negative say on pay vote. In particular, despite having their executive compensation program rejected by a majority of voting shareholders, the Board has done nothing meaningful in response, in direct violations of their fiduciary duties.

106. Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to FirstMerit and its shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of FirstMerit and its shareholders. As directors and/or officers of FirstMerit, Defendants participated in

28

the wrongful acts alleged herein.  They thereby breached their fiduciary duties to FirstMerit's shareholders.

107.    In committing the wrongful acts particularized herein, Defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design.

108.    Defendants' misconduct was not due to an honest error of judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

109.    By reason of the foregoing acts, practices and course of conduct, Defendants have failed to exercise good faith and instead have acted knowingly or in reckless disregard of their fiduciary obligations toward FirstMerit and its public shareholders, harming FirstMerit.

**FOURTH CAUSE OF ACTION**
**Against Defendants for Unjust Enrichment**

110.    Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

111.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of FirstMerit, in the form of unjustified salaries, benefits, stock option grants and other emoluments of office.

112.    All the payments and benefits provided to Defendants based upon or related to Defendants' executive compensation scheme were unjustly awarded and at the expense of FirstMerit, resulting in substantially unearned benefits.

113.    Defendants should be ordered to disgorge the gains which they have and/or will unjustly obtain and/or a constructive trust should be imposed for the benefit of the Company.

**FIFTH CAUSE OF ACTION**
**Against Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

29

115.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934,
provides that no proxy statement shall contain "any statement which, at the time and in the light of
the circumstances under which it is made, is false or misleading with respect to any material fact, or
which omits to state any material fact necessary in order to make the statements therein not false or
misleading." 17 C.F.R. §240.14a-9.  Specifically, the Proxy violated §14(a) and Rule 14a-9 because
it omitted material facts regarding the Company's compensation practices.

116.    The Proxy was false and misleading when issued because it falsely stated that the
Board's pay-for-performance policy was designed "to encourage and reward the achievement of our
long-term interests and the creation of long-term shareholder value."

117.    These statements were false and misleading because, as described, *supra*, in 2011,
FirstMerit's stock likewise suffered enormous erosion in value of over 20%.  Moreover,
shareholders' five year total shareholder return at the time the Proxy was issued was negative 19.4%.

118.    In the exercise of reasonable care, Defendants should have known that the statements
contained in the Proxy were materially false and misleading.

119.    The misrepresentations and omissions in the Proxy were material to Plaintiff and
FirstMerit stockholders in voting on the Proxy.  The Proxy was an essential link in the
accomplishment of the continuation of Defendants' violation of the Company's compensation
policies, as revelations of the truth would have immediately thwarted a continuation of shareholders'
endorsement of the directors' positions, the executive officers' compensation, and the Company's
compensation policies.

120.    The Company was damaged as a result of Defendants' material misrepresentations
and omissions in the Proxy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against Defendants and in favor of FirstMerit for the amount of damages sustained by the Company as a result of Defendants' violations of state and federal law;

B.     Extraordinary equitable and/or injunctive relief as necessary or permitted by law, equity and the statutory provisions sued hereunder, including disgorgement, attachment, impoundment, imposition of a constructive trust on or otherwise restricting the disposition/exercise of improvidently awarded executive compensation based upon false financial reporting and/or the proceeds of Defendants' trading activities or their other assets so as to ensure that Plaintiff on behalf of FirstMerit has an effective remedy;

C.     Ordering the implementation and administration of internal controls and systems at FirstMerit designed to prohibit and prevent excessive and/or unwarranted executive compensation payments to FirstMerit's senior executives;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, and accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 8, 2012                 Respectfully Submitted,

                                        STRAUSS TROY


                                        BY: /s/ Richard S. Wayne
                                            Richard S. Wayne (Ohio Atty. #0022390)
                                            Thomas P. Glass (Ohio Atty. #0062382)
                                            150 E. Fourth Street
                                            Cincinnati, OH 45202-4018
                                            Telephone: (513) 621-2120
                                            Facsimile: (513) 629-9426
                                            Email: rswayne@strausstroy.com
                                            Email: tpglass@strausstroy.com

                                        Liaison Counsel

                                        THE WEISER LAW FIRM, P.C.
                                        Robert B. Weiser
                                        Brett D. Stecker

31

Christopher L. Nelson
Jeffrey J. Ciarlanto
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

Lead Counsel

LAW OFFICE OF ALFRED G. YATES,
JR., P.C.
Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033

Other Counsel for The Robinson Trust

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was filed electronically with the U.S. District Court for the Northern District of Ohio this 8th day of November, 2012 via the Court's ECF filing system and notice of this filing will be sent to all parties by operation of the Court's ECF system. Parties may access this filing through the Court's system.  If a party is not given notice electronically through the Court's system a copy will be served by ordinary United States mail, first class postage prepaid, this 8th day of November, 2012.

/s/ Richard S. Wayne
Richard S. Wayne (Ohio Atty. #0022390)

## FIRSTMERIT CORPORATION VERIFICATION

John N. Robinson and Martha L. Robinson, on behalf of, and as trustees for, The Robinson Family Trust, hereby verify that we are familiar with the allegations in the Amended Consolidated Verified Shareholder Derivative Complaint, and that we have authorized the filing of the Amended Consolidated Verified Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of our knowledge, information, and belief.

Date: _11/7/12_

John N. Robinson

Date: _11-7-12_

Martha L. Robinson